LF 028
(Rev. 11/04/2019)

FILED IN CLERK'S OFFICE
U.S.D.C. Rome

## PRISONER CIVIL RIGHTS COMPLAINT

APR 28 2026

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA

KEVIN P WEIMER, Clerk
By_____ Deputy Clerk

---

DOWALKIE M⁀KENZIE 1129133

(Enter above the full name and prisoner
identification number of the plaintiff, GDC
number if a state prisoner.)

4:26-CV- 108

-vs-

TYROME OLIVER COMMISSIONER

THERE ARE 29 DEFENDANTS

PLEASE SEE ATTACHED SHEETS

(Enter above the full name of the defendant(s).)

(PAGES 7-10) FOR ALL DEFENDANTS

---

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the Court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

---

I. **Previous Lawsuits**

   A.    Have you filed other lawsuits in federal court while incarcerated in any institution?

          Yes ( )    No (✓)

   B.    If your answer to A is yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

       1.    Parties to this previous lawsuit:

          Plaintiff(s): _____

          _____

LF 028
Rev. 11/04/2019

Defendant(s): _____

_____

2.    Court (name the district):

_____

_____

3.    Docket Number: _____

4.    Name of judge to whom case was assigned: _____

5.    Did the previous case involve the same facts?

Yes ( )    No ( )

6.    Disposition (Was the case dismissed? Was it appealed? Is it still pending?):

_____

_____

7.    Approximate date of filing lawsuit: _____

8.    Approximate date of disposition: _____

II.    Exhaustion of Administrative Remedies
Pursuant to 28 U.S.C. § 1997e(a), no prisoner civil rights action shall be brought in federal court until all available administrative remedies are exhausted. Your case may be dismissed if you have not exhausted your administrative remedies.

A.    Place of Present Confinement:    HAYS STATE PRISON

B.    Is there a prisoner grievance procedure in this institution?

Yes (✓)    No ( )

C.    Did you present the facts relating to your complaint under the institution's grievance procedure?

Yes (✓)    No ( )

D.    If your answer is YES:
1.    What steps did you take and what were the results?
I FILED TWO GRIEVANCES ON THE FACTS THAT ARE GRIEVABLE. ONE GRIEVANCE WAS DENIED. THE OTHER WAS NEVER PROCESSED.
_____

2

LF 028
Rev. 11/04/2019

2.    If your answer is NO, explain why not: _____

III.    Parties
(In item A below, place your name in the first blank and place your present address in the second blank.)

A.    Name of Plaintiff: DOWAINE MCKENZIE 1129133

Address(es):    HAYS STATE PRISON
7777 UNDERWOOD DR. P.O. Box 668
TRION GA 30753

(In item B below, place the full name of the defendant in the first blank, his/her official position in the second blank, and his/her place of employment in the third blank. Do the same for each additional defendant, if any.)

B.    Defendant(s): PLEASE SEE ATTACHED SHEETS
FOR ALL DEFENDANTS. (PGS 7-10)

Employed as _____

at _____

IV.    Basis for Jurisdiction
Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

( ) Federal official (a *Bivens* claim)
(✓) State or local officials (a § 1983 claim)

3

LF 028
Rev. 11/04/2019

B.  Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

PLEASE SEE ATTACHED SHEETS

C.  Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

V.  **Prisoner Status**
Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

( ) Pretrial detainee
( ) Immigration detainee
(✓) Convicted and sentenced state prisoner
( ) Convicted and sentenced federal prisoner
( ) Other *(explain)* _____

VI.  **Statement of Claim**
State here as briefly as possible the facts of your case. Tell the court WHAT you contend happened to you, WHEN the incident(s) you complain about occurred, WHERE the incident(s) took place, HOW your constitutional rights were violated, and WHO violated them. Do **not** give any legal arguments or cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. (Use as much space as you need. Attach extra sheets if necessary.)

PLEASE SEE ATTACHED SHEETS

4

LF 028
Rev. 11/04/2019

PLEASE SEE ATTACHED SHEETS

Signed this __21st__ day of __March__, 20__26__.

_Dowain McKenzie_
Signature of Plaintiff

STATE OF __GEORGIA__
COUNTY (CITY) OF __TRION CHATTOOGA COUNTY__

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON __3-21-26__
(Date)

_Dowaine McKenzie_
Signature of Plaintiff

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| DOWAINE MCKENZIE, | * | CASE NO. |
| Plaintiff | * | |
| | * | |
| v. | * | 42 USC § 1983 |
| | * | **Civil Rights** |
| TYRONE OLIVER, Commissioner, | * | **PLAINTIFF'S** |
| AHMAD HOLT, Assistant Commissioner, | * | **COMPLAINT** |

BENJAMIN FORD, Field Operations Director,
JENNIFER AMMONS, Legal Director,
DR. KENNETH ELLIS, Chaplaincy Director,
MATTHEW KENNEDY, Statewide Tier Coordinator,
DERRICK MCKINNEY, Statewide STG Coordinator,
ANTOINE CALDWELL, Regional Director,
ANNETTIA TOBY, Regional Director,
TARMARSHE SMITH, Deputy Regional Director,
JERMAINE WHITE, Regional Director,
 Georgia Department of Corrections ("GDC") Defendants,
GEORGIA DEPARTMENT OF CORRECTIONS,
STATE OF GEORGIA,
JOSHUA JONES, Warden,
CHRISTOPHER MCALISTER, Deputy Warden, Security,
GABRIEL ILLA, Acting Deputy Warden of Security,
ALISA HAMMOCK-EVANS, Deputy Warden of Care & Treatment,
JONATHAN SWINFORD, Deputy Warden of Administration,
AARON ROWLAND, Unit Manager,
KIMBERLY STEWART, Unit Manager,
GEORGE R. BRADLEY, JR., Unit Manager,
WILLIAM AVERETT, Unit Manager,
BILLY PORTER, Unit Manager,
SCOTT LOWE, Chief of Security, Captain,
JAY COUCH, Acting Chief Counselor,
 Hays State Prison ("HSP") Management Team,
Lt. NICHOLAS STEWART, Tier-II Lieutenant,
Sgt. ANTOINE MCGHEE, STG Sergeant,
Sgt. JAMI DENISE STRICKLIN, Property Sergeant,
 Hays State Prison ("HSP"),

1

AARON PINEIRO, Warden,
    Phillips State Prison ("PSP"),
    Defendants,

## I. INTRODUCTION

1. COMES NOW DOWAINE MCKENZIE, Plaintiff above-styled, and brings this action against Defendants pursuant to 42 USC § 1983 and the Religious Land Use And Institutionalized Persons Act ("RLUIPA"), 42 USC §§ 2000cc-1 *et seq.*, for violations of his rights under the United States Constitution and the RLUIPA.

## II. JURISDICTION AND VENUE

2. This court has original jurisdiction pursuant to 28 USC §§ 1331, 1343.

3. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 USC §§ 2201, 2202.

4. Venue is proper in this district pursuant to 28 USC 1391(b)(2) because some of the events giving rise to Plaintiff's claims occurred in this district.

5. Venue is proper in this district pursuant to 28 USC 1391(b)(1) because all of the Defendants reside in the State of Georgia and most reside in this district.

## III. PARTIES

6. Plaintiff is Dowaine McKenzie. Plaintiff is currently incarcerated in the State of Georgia. Plaintiff may be served in his place of incarceration at: #1129133, Hays State Prison, 777 Underwood Drive, P.O. Box 668, Trion, Chattooga County, GA 30753.

7. GDC Central Office Defendants at times relevant to this case include: Commissioner Tyrone Oliver; Assistant Commissioner Ahmad Holt; Facilities Director Benjamin Ford; General Counsel Jennifer Ammons; Chaplaincy Director; Dr. Kenneth Ellis; Statewide Tier Coordinator Matthew Kennedy; Statewide Security Threat Group ("STG") Coordinator Derrick McKinney; Regional

2

Directors Antoine Caldwell, Annettia Toby, Jermaine White; Deputy Regional Director Tarmarshe Smith. These Defendants shall hereafter be referred to collectively as "GDC Central Office Defendants," or "GDC Defendants," and are sued in their individual capacities for damages and in their official capacities for declaratory, prospective, equitable, and injunctive relief, and may be served at: GDC, 300 Patrol Road, Gibson Hall, Forsyth, GA 31029.

8. Defendant Georgia Department of Corrections ("GDC") is included with "GDC Defendants," is sued pursuant to 42 USC § 2000cc-5(4)(A)(ii), for declaratory, prospective, equitable, and injunctive relief, and may be served at: GDC, 300 Patrol Road, Forsyth, Monroe County, GA 31029.

9. Defendant State of Georgia is included with "GDC Defendants," is sued pursuant to 42 USC § 2000cc-5(4)(A)(i), for declaratory, prospective, equitable, and injunctive relief, and may be served at: GDC, 300 Patrol Road, Forsyth, Monroe County, GA 31029.

10. Hays State Prison ("HSP") Management Team Defendants include: Warden Joshua Jones; Deputy Wardens of Security Christopher McAlister and Gabriel Illa; Deputy Warden of Care & Treatments Alisa Hammock-Evans; Deputy Warden of Administration Jonathan Swinford; Unit Managers Aaron Rowland, George Bradley, William Averett, Billy Porter, and Kimberly Stewart; and Chief Counselor Jay Couch; and Captain Scott Lowe. These Defendants are, or at times relevant to this case were, all members of the HSP Management Team. All HSP Management Team Defendants are sued in their individual capacities for damages and in their official capacities for declaratory, prospective, equitable, and injunctive relief. HSP Management Team Defendants may be served at: Hays S.P., 777 Underwood Drive, P.O. Box 668, Trion, GA 30753.

11. Other Hays State Prison ("HSP") Defendants include: Tier-II Lieutenant Nicholas Stewart; STG Sergeant Antoine McGhee; and Property Sergeant Jami

3

Denise Stricklin. All HSP Defendants are sued in their individual capacities for damages and in their official capacities for declaratory, prospective, equitable, and injunctive relief. HSP Defendants may be served at: Hays S.P., 777 Underwood Drive, P.O. Box 668, Trion, GA 30753.

12. Defendant Aaron Pineiro is Warden at Phillips State Prison ("PSP"). Defendant Pineiro is sued in his in their individual capacity for damages and in his official capacity for declaratory, prospective, equitable, and injunctive relief. Defendant Pineiro may be served at: Phillips S.P., 2989 West Rock Quarry Road, Buford, GA 30519, Gwinnett County.

13. The primary claims in this case are Plaintiff's claims in Counts 1-28 that Defendants violated his rights to due process in connection with his Tier-II segregation placement as well as any disciplinary reports or incident reports used to justify his Tier-II segregation placement. All Defendants are properly joined under Fed.R.Civ.P. 20(a)(2) either because they adopt, implement, or maintain the same policies and customs that caused the violations of Plaintiff's rights, or because they personally participated in the violations of Plaintiff's rights. All GDC, HSP, and PSP Defendants are properly joined because their policies, customs, acts, and omissions, caused Plaintiff to be placed on Tier-II segregation or because they personally participated in his Tier-II segregation placement, and they occurred as part of the "same series of transactions or occurrences," and they raise common questions of fact and law.

14. Plaintiff's claims regarding the conditions of confinement on Tier-II segregation are properly joined against the existing Defendants under Fed.R.Civ.P. 18(a).

## I. STATEMENT OF FACTS

### A. Introduction

4

15. Plaintiff has been incarcerated in the Georgia Department of Corrections ("GDC") from September 16, 2014 to date:

16. The GDC Commissioner exercises final decision-making authority over prison transfers and related policies and practices under authority delegated to him by the Governor and the Board of Corrections under Georgia law. At times relevant to this case, the GDC Central Office Management Team consisted of those Defendants identified above in Paragraph 7, *supra*.

17. Each GDC facility consists of a Management Team that includes the warden, all deputy wardens, all unit managers, the chief counselor, and the chief of security. The management team adopts, implements, and enforces all GDC policies and customs at the local (facility) level. They also adopt and implement local policies and customs.

18. At times relevant to this case, the HSP Management Team consisted of those Defendants identified above in Paragraph 10, *supra*.

**B. Introduction to the GDC Tier Program.**

19. General Population ("GP") prisoners are allowed out of their cells about 19 hours each day and are allowed to participate in religious services, counseling classes, educational classes, work details, yard call, gym call, library call, law library, and other out-of-cell activities. Tier II prisoners are locked down in one-man cells with solid steel doors 24 hours a day and are denied all to religious

services, counseling classes, educational classes, work details, yard call, gym call, library call, law library, and other out-of-cell activities.

20. Prisoners on segregation are usually placed on one of three(3) tiers: Tier I, Tier II, or Tier III.

### 1. Administrative Segregation

21. Administrative Segregation is governed by GDC Standard Operating Procedure (hereinafter "SOP") 209.06 (IIB09-0001), "Administrative Segregation." § IV.H. provides in pertinent part:

> 7. Each offender, shall be allowed to write and receive mail in the same manner as general population offenders.
> 8. Visiting and correspondence privileges accorded the general population shall be allowed to offenders in Administrative Segregation (see SOP 227.05).
> ...
> 10. Offenders in administrative segregation shall have access to reading materials. Each facility shall establish a procedure for offenders to receive library services.
> ...
> 13. An offender shall normally be assigned all his or her personal property consistent with the length of assignment, security needs of the unit, and in accordance with established housekeeping plans of the unit.
> 14. Offenders shall continue to receive the services of a Counselor. Offenders may participate in such educational, vocational and/or rehabilitative programs as can be provided within the confines of the Administrative Segregation unit, consistent with the security needs of the unit.

22. GDC SOP 209.06 § IV.E.2. provides in pertinent part:

6

Within 24-hours of initial placement in Administrative Segregation, the Deputy Warden/Assistant Superintendent/Unit Manager/Duty Officer shall determine one of the following regarding the offender's status:

a. Return the offender to the appropriate housing unit, or

b. Order the offender to remain in Administrative Segregation.

**Note:** Offender initial placement shall be approved by a person of higher authority than the person who ordered the initial placement in Administrative Segregation within 24 hours. The higher authority shall not have been involved in the initial placement of the offender.

23. GDC SOP 209 § IV.F. provides in pertinent part:

96-hour Formal Hearing for Voluntary/Involuntary Assignment to Protective Custody and Administrative Segregation: Once the Deputy Warden's/Assistant Superintendent's/Unit Manager's/Duty Officer's 24-hour review has been completed, the Classification Committee shall have 96-hours to complete the formal hearing utilizing Attachment 2, 96-Hour Segregation Hearing Report.

1. For the 96-hour Administrative Segregation formal hearing the offender may request an employee who is on duty and willing to represent the offender by being the offender's advocate at this hearing.

2. The offender may also request that witnesses be called on his/her behalf and the Classification Committee will have the discretion to call these witnesses.

3. If the Classification Committee determines the offender should remain in Administrative Segregation, the offender may appeal that decision to the Warden/Superintendent.

4. The offender shall have three (3) business days after the 96-hour hearing to appeal the decision of the Classification Committee. Attachment 4, Administrative Segregation Assignment Appeal

7

Form, shall be submitted to the Counselor conducting rounds. Upon receiving Attachment 4, the Counselor shall issue the offender a receipt, acknowledging that the appeal was received. The Counselor shall then forward the appeal form to the Warden/Superintendent.

5. The Warden's/Superintendent's review and decision on the appeal is final.

6. If the offender's status changes, another 96-Hour Segregation Hearing must be conducted. For example, if the original assignment was for pending investigation and the status changes to pending disciplinary hearing, then the offender may appeal this hearing. (see IV.F.4.)

7. The offender shall receive a copy of Attachment 2, 96-Hour Hearing Report.

## 2. Tier I

24. Prisoners on Tier I are usually placed on it for up to thirty(30) days. Tier I prisoners have normal in-cell benefits, such as possession of personal property, commissary, book packages, clothing packages, and food packages. However, they do not have normal out-of-cell benefits, such as religious services, educational classes, counseling classes, work detail, library, law library, gym call, yard call.

25. Tier I is governed by GDC SOP 209.07 (IIB09-0002), "Segregation-Tier I, Disciplinary, Protective Custody and Transient Housing." § VI.E provides:

4. Visiting and correspondence privileges accorded to general population shall be allowed to offenders in Tier I Program (see SOP IIB01-0005). No restrictions shall be placed upon an offender's contact with courts or legal counsel. Protective custody and disciplinary segregation offenders shall in general have the same rights to visitation as general population offenders unless this is

8

not feasible. Non-feasibility must be documented. An example would include offenders with documented assaultive and destructive behavior.
* * *
7. An offender shall normally be assigned all of his or her personal property contingent upon the security needs of the unit.

### 3. Disciplinary Isolation

26. Prisoners who receive disciplinary reports (hereinafter "DR's") may receive a form of Tier I called "Disciplinary Isolation" if found guilty of an infraction. Disciplinary Isolation is governed by GDC SOP 209.03 (IIB02-0004), "Disciplinary Isolation." § IV.B.1 provides in pertinent part:

Before placing an offender in a cell, the offender will be strip searched and then his/her property shall be inventoried and stored in accordance with SOP 206.02, Management of Offender Property. Offenders shall be authorized the following property while in Disciplinary Isolation:
a. One (1) pair of coveralls or applicable clothing;
b. One (1) pair of shower shoes (state issued);
c. One (1) pillow;
d. One (1) pillow case;
e. One (1) blanket (summer), Two (2) blankets (winter);
f. Two (2) sheets;
g. One (1) mattress;
h. One (1) toothbrush;
i. One (1) container of shampoo;
j. One (1) tube of toothpaste;
k. One (1) bar of soap;
l. One (1) applicator of deodorant;
m. One (1) towel;
n. One (1) drinking cup;
o. One (1) roll toilet tissue;

9

p. One (1) approved religious text of choice (if requested by offender);
q. One (1) pen or pencil (if requested by offender);
r. Three (3) envelopes with stamps per week (if requested by offender);
s. Three (3) sheets of paper;
t. Legal materials; and
u. Medication in blister packs in compliance with SOP 507.04.43, Medication Distribution System. If the offender's behavior demonstrates a high potential for self-harm, blister packed medication may be withheld at the discretion of the health care provider. If correctional staff have any questions regarding whether an offender should maintain blister packed medication in his/her possession, medical staff should be notified for proper verification.

27. Pursuant to this SOP, prisoners on Disciplinary Isolation are <u>not</u> allowed their personal property, hardcover books, softcover books, magazines, newspapers, CD's or cassettes, CD or cassette players, radios, JPay tablet computers, personal clothing, personal hygiene items, food items, or other personal property.

28. GDC SOP 209.03 § IV.B.1 provides in pertinent part:

Offenders shall not be allowed telephone or visitation privileges while in Disciplinary Isolation. However, offenders shall be allowed the opportunity to make phone calls to their Attorney of Record and PREA reporting calls. The Warden/Superintendent shall grant all other calls and visitation on a case by case basis. These calls shall be logged in the post logbook, and visits recorded in the Visitation Queue of SCRIBE.

29. Prisoners on Disciplinary Isolation are denied access to personal property, phone calls, visitation, and other privileges.

30. However, prisoners may not be placed on Disciplinary Isolation for a period longer than thirty(30) days. GDC SOP 209.01 § IV.W provides:

> **Limitation on Disciplinary Isolation:** The following limitations apply to Disciplinary Isolation:
> 1. 30-Day Limit for Prisons and Transitional Centers: Confinement to an isolation cell more than thirty (30) consecutive days shall not be imposed;
> 2. If isolation time imposed exceeds thirty (30) days due to being necessary to control and encourage behavioral change, a recommendation for placement of the offender in the Tier II program is warranted[.]

### 4. Tier II

31. Tier II is a form of disciplinary segregation consisting of at least nine(9) months solitary confinement, and broken down into three(3) phases, Phase 1, Phase 2, or Phase 3, of at least ninety(90) days on each phase.

32. Tier II is governed by GDC SOP 209.08 (IIB09-0003), "Administrative Segregation – Tier II." SOP IIB09-0003, (Policy 209.08), Attachment 4, "Tier II Program Handout," provides that: "Offenders assigned to the Tier II Unit have been placed in Administration Segregation for long-term disciplinary sanctions."

33. GDC SOP 209.08 § III.D provides:

> **Offenders under [sic] Transition (O.U.T.) Program:** Cognitive Behavioral Program utilized in the Tier II facilities designed to enhance an offenders' [sic] motivation to change problem behaviors, criminal thinking, and provide pro-social skills. The curriculum is based on the cognitive behavioral treatment model and motivational interviewing techniques.

34. GDC SOP 209.08 § IV.F.5 provides:

11

Release from Tier II:

a. The offender must be actively participating in the O.U.T. Program (Offenders Under Transition). If appropriate, the offender must successfully complete the program prior to release from Tier II.

35. GDC SOP 209.08 § IV.G provides:

Staffing:

1. Assignment to duty in the Tier II Program is regarded as hazardous. Personnel assigned are expected to deal professionally with unpleasant and irrational behavior.

2. Because of the unusual difficulty of the work to be done, the Warden (or Designee) must specifically approve the assignment of uniformed officers, counselors, medical or other staff members to the Tier II Program.

### 5. GDCP/SMU/Tier III

36. Tier III is similar to Tier II, except that it is at that Georgia Diagnostic & Classification Prison ("GDCP") Special Management Unit ("SMU").

GDCP/SMU/Tier III is governed by GDC SOP 209.09 (IIB09-0004), "Special Management Unit Tier III Program."[1]

### C. Criteria for Tier II/III to the GDC Tier Program.

---

[1] A copy of this SOP effective 09/06/2012 can be found online on PACER, www.pacer.gov at Gumm v. Jacobs, No. 5:15-CV-00041-MTT-CHW (M.D.Ga May 14, 2018) (Doc. 140-1 therein). A copy of this SOP effective 08/01/2013 can be found on PACER, at: Id. (Doc. 140-2 therein). A copy of this SOP effective 04/03/2015 can be found on PACER, at: Id. (Doc. 140-3 therein). A copy of this SOP effective 08/08/2016 can be found on PACER, at: Id. (Doc. 140-4 therein). A copy of this SOP effective 11/08/2017 can be found on PACER, at: Id. (Doc. 140-4 therein).

12

37. GDC SOP's pertaining to Tier II and III, SOP IIB09-0003, "Administrative Segregation – Tier II," (effective August 1, 2013) § VI.B.1.; SOP IIB09-0004, "Special Management Unit – Tier III," (effective August 1, 2013) § VI.B.1, are similar and nearly identical, often verbatim. The criteria for placement on Tier II and III are nearly identical. Thus, when a prisoner qualifies for either Tier II or III, he almost always qualifies for the other, with one relevant exception.

38. Prior to Gumm, GDC SOP's provided that a prisoner can be placed on Tier I, Tier II, or GDCP/SMU/Tier III whenever "The offender is noted as a threat to the safe and secure operation of the facility." SOP IIB09-0002, "Segregation – Tier I," (effective August 1, 2013) § I.A.; SOP IIB09-0003, "Administrative Segregation – Tier II," (effective August 1, 2013) § VI.B.1.; SOP IIB09-0004, "Special Management Unit – Tier III," (effective August 1, 2013) § VI.B.1. On May 7, 2019, the Middle District of Georgia entered a Final Order And Permanent Injunction ordering that "The criteria for assignment to the SMU or Tier III Program shall be modified to eliminate the provision that allows any inmate to be assigned to the SMU if he is deemed 'a threat to the safe and secure operation of the facility.'" Gumm v. Jacobs, No. 5:15-CV-00041-MTT-CHW (M.D.Ga. May 7, 2019) (Docs. 256-1 therein at 11, § III, ¶¶ 47). GDC SOP 209.09 (IIB09-0004), "Special Management Unit - Tier III Program," was amended effective 09/06/2019, to eliminate this provision. Despite Gumm, GDC SOP 209.08 (IIB09-

0003) still allows any inmate to be assigned to Tier II if he is deemed "a threat to the safe and secure operation of the facility." This criterion is so vague and broad that it can be applied virtually at any time and in any circumstance that could arise in a prison setting. In practice, if prison officials like a prisoner, they place him on Tier I or in General Population. If they do not, they place him on Tier II As a result, prisoners who file grievances or lawsuits against GDC officials are frequently placed on Tier II stating that "The offender is noted as a threat to the safe and secure operation of the facility," as a pretext for retaliation for filing grievances or lawsuits, whereas similar situated prisoners who do not grievances or lawsuits against GDC officials are frequently placed on Tier I stating that "The offender is noted as a threat to the safe and secure operation of the facility," and/or returned to General Population.

**D. Denial of Due Process on Tier II Placements and 90-Day Reviews**

39. When a prisoner is placed on Tier II, he is not provided either advance notice or a hearing. While prison officials provide what they call a "Tier II hearing," a Tier II hearing is really <u>not</u> a hearing at all, but a verbal *notification* of a decision already made. Nothing a prisoner says at a so-called "Tier II hearing" can change the outcome because the decision was already made beforehand. The decision is made without any advance notice to the prisoner. After the decision is made, the Tier II committee, or sometimes even just a single member thereof, will

14

go to the prisoner's cell door, notify him that "You are being placed on Tier II for [whatever reason they use to assign him to Tier II]." The committee or member will then ask the prisoner to sign the pre-generated Tier II "Assignment Memo," which shows that the form was pre-generated and the decision was made before it is given to the prisoner. After the prisoner signs the pre-generated "Assignment Memo," he is then issued a pre-generated "Appeal Form." Prisoners are not given any opportunity to speak, be heard, call witnesses, or present documentary evidence at a so-called "Tier II hearing" because, again, it is not a hearing at all, but a verbal *notice* of a decision already made. If a prisoner has a rebuttal or protest of his placement on Tier II, he is told to "put it on your appeal form."

40. After being assigned to Tier II, prisoners may submit an appeal form, consisting of space for about one(1) paragraph on the appeal form itself, plus up to only one(1) attached page, to be forwarded to the GDC Facilities Director. A prisoner may not call witnesses, submit or attach written witness statements, or submit or attach other documentary evidence in support of an appeal. In practice, the GDC Facilities Director has designated Statewide Tier Coordinator to decide all Tier II Appeals. In practice, they have a pattern of consistently rubberstamp-denying all Tier II appeals.

41. After a prisoner is placed on Tier II, he is supposed to be provided a Tier-II Review every 90 days. While prison officials provide what they call a "Tier

15

II 90-Day Review hearing," a "Tier II 90-Day Review hearing"—like an initial Tier II hearing—is really not a hearing at all, but a verbal *notice* of a decision already made. Nothing a prisoner says at a so-called "Tier II 90-Day Review hearing" can change the outcome because the decision was already made beforehand. The decision is made without any advance notice to the prisoner. After the decision is made, the Tier II committee, or sometimes even just a single member thereof, will go to the prisoner's cell door, notify him that "You are being placed on [whatever phase they put him on] for [whatever reason they use to assign him to whatever phase]." The committee or member will then ask the prisoner to sign the pre-generated Tier II "Assignment Memo," which shows that the form was pre-generated and the decision was made before it is given to the prisoner. After the prisoner signs the pre-generated "90-Day Review Memo," he is then issued a pre-generated "90-Day Review Appeal Form." Prisoners are not given any opportunity to speak, be heard, call witnesses, or present documentary evidence at a so-called "Tier II 90-Day Review hearing" because, again, it is not a hearing at all, but a verbal *notice* of a decision already made. If a prisoner has a rebuttal or protest of the decision, he is told to "put it on your appeal form."

42. After a Tier II 90-Day Review, prisoners may submit a 90-Day Review appeal form, consisting of space for about one(1) paragraph on the appeal form itself, plus up to only one(1) attached page, to be forwarded to the warden. A

16

prisoner may not call witnesses, submit or attach written witness statements, or submit or attach other documentary evidence in support of an appeal. In practice, GDC Wardens consistently rubberstamp-deny all Tier II 90-Day Review Appeals.

43. If a prisoner is placed or kept on Tier II because of a DR and the DR is later dismissed or expunged, he has no way to seek reconsideration of his placement on Tier II.

### E. Denial of due process in Plaintiff's placement on Tier-II Segregation.

44. On April 10, 2025, Plaintiff was transferred from Phillips State Prison ("PSP") to Georgia Diagnostic Classification Prison ("GDCP") to be transferred to another prison. However, he was not transferred to another prison but was transferred back to PSP and was placed on administrative segregation.

45. On April 17, 2025, Plaintiff was transferred from PSP to Hays State Prison ("HSP").

46. Upon his arrival at HSP, STG Sgt. Antwoine McGhee told Plaintiff he would be placed on Tier-II segregation. Plaintiff asked why, and Sgt. McGhee said that Plaintiff stabbed a guard with a knife at PSP. Plaintiff said that that was lie and asked where McGhee got this information. McGhee refused to answer.

47. Later that day, during the intake process, Plaintiff asked Warden Joshua Jones why he was being placed on Tier-II segregation. Jones said that Plaintiff had a map of the prison and plans to escape. Plaintiff said that that was lie and asked

17

where Jones got this information. Jones said that PSP Warden Aaron Pineiro sent him an email telling him to place Plaintiff on Tier II because Plaintiff had a map of the prison and plans to escape and that HSP was waiting on PSP to send some paperwork on the matter.

48. While going through the intake process, Sgt. Jami Denise Stricklin denied Plaintiff all his property because she told him he was going on Tier-II segregation.

49. On April 22, 2025, Plaintiff spoke with Deputy Warden Christopher McAlister and asked why he was placed on Tier-II segregation. Plaintiff stated that he never received any disciplinary report ("DR") regarding any matter on the basis of which he was being placed on Tier-II segregation. McAlister said he did not know but that he would find out.

50. On April 24, 2025, Plaintiff filed Grievance #380741. On May 30, 2025, Plaintiff received a response to his Grievance #380741 regarding his Tier-II segregation placement. The response stated that Plaintiff was not on Tier-II segregation but was on Tier-I segregation for failing a drug test, but that HSP was waiting on PSP to send paperwork regarding his Tier-II segregation placement.

51. On April 24, 2025, Plaintiff was told by Counselor Misty Sue Van Apeldoorn, that he was officially placed on Tier-II Phase 1. Plaintiff stated that he

18

had never received any Tier-II segregation placement hearing or an appeal form and never had an opportunity to appeal.

52. On April 30, 2025, McAlister informed Plaintiff that there was no DR regarding anything that happened at PSP but that PSP told HSP that they we going to send a DR for Plaintiff.

53. On May 4, 2025, Plaintiff wrote to Warden Jones and requested to be removed from Tier-II segregation. Jones never responded to this letter.

54. On May 12, 2025, Unit Manager George Bradley and Lt. Nicholas Stewart sent an Inmate orderly to ask Plaintiff if he would take a roommate. Plaintiff stated that he would refuse a roommate because he feared for his life based on a previous incident that occurred the last time Plaintiff was at HSP. Plaintiff requested protective custody.

55. On May 14, 2025, because Plaintiff refused to accept a roommate and requested protective custody, Bradley and Stewart retaliated against Plaintiff by placing him on Tier-II Phase 1 phone restriction, which only allowed Plaintiff to make one(1) phone call per month. Prior to this date, Plaintiff was allowed to make collect phone calls without any restrictions.

56. On May 14, 2025, McAlister informed Plaintiff that there was no paperwork in the GDC SCRIBE database that would justify his placement on Tier-II segregation.

57. On May 15, 2025, Plaintiff received a written notification that, on May 13, 2025, the Tier-II classification committee—Unit Manager George Bradley, Lt. Nicholas Stewart, and Chief Counselor Jay Couch—formally placed him on Tier-II segregation. Plaintiff never had any advance written notification, nor any hearing at which he could speak or present a defense, nor any opportunity to call witnesses or present documentary evidence.

58. On May 16, 2025, Plaintiff turned in his Tier-II Appeal form to Counselor Van Apeldoorn. Although GDC SOP states that the GDC Facilities Director or his Designee are supposed to decide the appeal within 14 days, Plaintiff never received any response to his appeal, and the GDC deadline for response has expired without any response.

59. On May 23, 2025, Plaintiff filed a Grievance #382082 alleging that he was placed on Tier-II segregation as retaliation because Plaintiff refused to accept a roommate and requested protective custody, On June 16, 2025, Warden Jones rejected Grievance #382082  as non-grievable.

60. On August 15, 2025, Plaintiff received a written notification that the Tier-II classification committee—Unit Manager George Bradley, Lt. Nicholas Stewart, and Chief Counselor Jay Couch—did his Tier-II 90-day Review and decided to keep him on Tier-II segregation. Plaintiff never had any advance written

20

notification, nor any hearing at which he could speak or present a defense, nor any opportunity to call witnesses or present documentary evidence.

61. On August 15, 2025, Plaintiff turned in his Tier-II 90-Day Review Appeal form to counselor Stephanie Mitchell. Although GDC SOP states that the Warden is supposed to decide the appeal within 7 days, Plaintiff never received any response to his appeal, and the GDC deadline for response has expired without any response.

### F. Denial of due process in Disciplinary Reports used to place Plaintiff on Tier II.

62. The GDC Disciplinary Procedure is set forth in GDC SOP IIB02-0001 (Policy Number 209.01), "Inmate Discipline." That SOP provides as follows: After a prisoner receives a disciplinary report ("DR"), he is supposed to be interviewed by a DR Investigator, who asks the prisoner for witness names and asks if he wants the assistance of a staff advocate. The investigator is supposed to interview and obtain witness statements from requested witnesses.[2] The SOP also does not require the DHO to provide any reasons for his findings.

---

2 Under earlier versions of the SOP, the staff advocate was supposed to assist the prisoner with obtaining or presenting documentary evidence which the prisoner might not be able to obtain or present himself, but under the current version of this SOP, the staff advocate does no such thing, denying the prisoner documentary evidence to which he does not have access, such as videos, photos, etc. Under earlier versions of this SOP, the Disciplinary Hearing Officer ("DHO") was supposed to allow the prisoner to call witnesses at a DR hearing, but under the current version, the DHO may exclude any and all witnesses.

63. Plaintiff has never received any disciplinary report ("DR") regarding any allegations on which his Tier-II segregation placement is allegedly based.

64. As to every DR which Plaintiff has received on prior occasions, Plaintiff has never been allowed any opportunity to call witnesses or present documentary evidence at any hearing, and has never had advocate assistance in presenting documentary evidence.

**G. Denial of due process in Incident Reports used to place Plaintiff on Tier II.**

65. The GDC Incident Report Procedure is set forth in GDC SOP 203.03 (IIA04-0002), "Incident Reporting." That SOP does <u>not</u> afford prisoners with the procedural due process protections required by <u>Sheley v. Dugger</u>, 833 F2d 1420, 1425(II.B.2) (11th.Cir.1986).

66. Plaintiff has never received any opportunity to call witnesses or present documentary evidence at any hearing, and has never had advocate assistance in presenting documentary evidence regarding any incident report ("IR") regarding any allegations on which his Tier-II segregation placement is allegedly based.

**H. Denial of First Amendment rights on Tier II.[3]**

**1. Denial of First Amendment free speech/ expression on Tier II.**

---

3 These facts are are presented to show that Tier II placement deprives Plaintiff of rights independently protected by the First Amendment of the Constitution, as is relevant to show deprivation of a liberty interest required to invoke the protections of the Due Process Clause, under <u>Sandin v. Conner</u>, 515 US 472, 115 SC 2293 (1995).

67. GP and Tier I prisoners have access to their own personal property, hardcover books, softcover books, magazines, newspapers, photographs, correspondence courses, radios and CD players and CD's, JPay tablet computers with which to download and listen to music and with which to watch educational programs, JPay tablet computers with which to send and receive emails, attachments, photographs, and video clips, from family members, friends, religious advisers, and other people. Tier II prisoners are <u>not</u> allowed any of these.

68. GP and Tier I prisoners have unlimited access to collect-call telephones, with which to call up to twenty(20) people on an approved phone list. Tier II Phase 1prisoners are allowed one(1) fifteen(15)-minute call per month. Tier II Phase 2 prisoners are allowed two(2) fifteen(15)-minute calls per month. Tier II Phase 3 prisoners are allowed three(3) fifteen(15)-minute calls per month. SOP IIB09-0001, (Policy 209.08), Attachment 4.

69. Contrary to their own SOP, Respondent have a custom of rejecting mail, including photographs and publications, sent to prisoners on Tier II, without providing notice to either the prisoner or sender, without providing either the prisoner or sender an opportunity to appeal or protest the decision, and without documenting the rejection. GDC officials simply return all such mail or publications without notification or documentation.

## 2. Denial of First Amendment court access on Tier II.

70. GP and Tier I prisoners are allowed to receive, possess, and read legal books, magazines, and newspapers. Tier II prisoners are <u>not</u> allowed such access. GP prisoners have access to the GP law library. Tier II prisoners do <u>not</u>. GP prisoners shall have access to both a reference library (i.e. library with books) as well as an electronic law library. SOP 227.03 (IIA14-0001), "Access to Courts," IIA14-0001, § VI.A.1.(a)-(b). That SOP also provides that, "Prisons that maintain lock down units of over 150 beds, where direct access to the prisons reference library, where direct access [visits] to the prisons reference library is not ordinarily provided, will [are supposed to] maintain a satellite reference library." However, HSP has a lock down unit of over 150 beds. Thus, according to GDC SOP, Defendants are required to maintain a satellite law library at the lockdown unit. However, they do not do so.

71. **Imminent Actual Injury #1:** Without access to a law library, Plaintiff is unable to conduct legal research to pursue any direct or collateral challenges to his conviction or sentence.

72. **Imminent Actual Injury #2:** Without access to a law library, Plaintiff is unable to conduct legal research with which to challenge his conditions of confinement, including this case. In addition, without access to a law library at all, Respondent is denying Plaintiff any and all "post-filing opportunity to research and formulate rebuttals to authorities cited in the responsive pleadings of the

24

adversary," <u>Daker v. Humphrey</u>, 294 Ga 504, 506 n.1, 755 SE2d 201, 202 n.1 (2014) (citing <u>Morrow v. Harwell</u>, 768 F.2d 619(II) (5th.Cir.1985)).

73. **Imminent Actual Injury #3:** Without access to a law library, Plaintiff is unable to conduct legal research with which to challenge his placement on segregated confinement in a habeas corpus petition. In addition, without access to a law library at all, Respondent is denying Plaintiff any and all "post-filing opportunity to research and formulate rebuttals to authorities cited in the responsive pleadings of the adversary," <u>Daker</u>, *supra* (citing <u>Morrow</u>, *supra*).

### 3. Denial of First Amendment religious exercise on Tier II.

74. GP prisoners have access to religious services. Tier II prisoners do <u>not</u>.

75. Plaintiff is Muslim, an adherent to the religion of Islam.

76. **Jumu'ah Islamic Service:** Part of the practice of Islam is that Muslims must attend Jumu'ah Islamic prayer service every Friday afternoon. GDC facilities have Jumu'ah Islamic prayer service every Friday afternoon. GP Muslims are allowed to attend Jumu'ah Islamic prayer service every Friday afternoon. Tier II prisoners are <u>not</u> allowed to attend.

77. **Ta'lim Islamic Service:** Part of the practice of Islam is that Muslims must attend Ta'lim Islamic services. GDC facilities have Ta'lim Islamic prayer service every week, the time and day for which may vary from prison to prison. GP

Muslims are allowed to attend Ta'lim Islamic prayer service every week. Tier II prisoners are <u>not</u> allowed to attend.

78. **'Eid Islamic Service and 'Eid Feast:** Part of the practice of Islam is the celebration of two annual holidays, called 'Eid: 'Eid-Ul-Fitr and 'Eid-Ul-Adha. 'Eid-Ul-Fitr is the celebration of the breaking of the month-long fast of the Islamic month of Ramadan each year on the Islamic calendar. 'Eid-Ul-Adha is the celebration of the sacrifice of Abraham, and is held during Hajj (Islamic pilgrimage) season each seventy (70) days after 'Eid-Ul-Fitr. Celebration of 'Eid consists of two parts: a special congregational salat (prayer) service and a special feast meal. The 'Eid salat itself consists of two parts: a congregational salat prayer followed by a sermon called a khutba. GP Muslims are allowed to attend the prayer service for both 'Eid-Ul-Fitr and 'Eid-Ul-Adha. Tier II prisoners are <u>not</u> allowed to attend the prayer service for either 'Eid-Ul-Fitr or 'Eid-Ul-Adha. GP Muslims are allowed to attend the feast for both 'Eid-Ul-Fitr and 'Eid-Ul-Adha. Tier II prisoners are <u>not</u> allowed to attend the feast for either 'Eid-Ul-Fitr or 'Eid-Ul-Adha.

## I. Violations of Eighth Amendment rights on Tier II Segregation at HSP.[4]

---

[4] These facts are are presented to show that Tier II placement deprives Plaintiff of rights independently protected by the Eighth Amendment of the Constitution, as is relevant to show deprivation of a liberty interest required to invoke the protections of the Due Process Clause, under <u>Sandin v. Conner</u>, 515 US 472, 115 SC 2293 (1995).

79. **Denial of adequate food:** Despite the contrary provisions of SOP, GDC and Respondent, maintain a custom in the GDC and at GSP of serving inadequate food to lockdown prisoners. As a result, segregation prisoners often have to be placed on medically prescribed special diets with extra food because their weight becomes unhealthily low.

80. Plaintiff has lost significant weight on Tier II segregation.

81. **Denial of adequate medical care.** Prisoners on HSP Segregation are often denied medical treatment because GDC and Respondent do not provide the necessary staff to escort HSP Segregation prisoners to their medical appointments. At HSP, the medical department often ignores and does not even answer medical request forms /sick call forms sent by prisoners from the lockdown units.

82. **Denial of sunlight:** At HSP, all Tier II cells have their windows painted over the exterior of the cells windows. As a result, when a prisoner trips the circuit breaker for his cell, it causes all prisoners in the surrounding cells on the same circuit breaker to be without either artificial light or sunlight in their cells. This causes other prisoners to have to any light in their cells and to live in cells that are close to pitch black for hours or days at a time.

83. **Denial of adequate dental care.** Segregation prisoners are often denied or delayed dental treatment because GDC and Respondent do not provide the necessary staff to escort HSP Segregation prisoners to their medical appointments.

27

In addition, the dentist only schedules appointments to see three(3) lockdown prisoners (out of almost 500) per week, resulting in lockdown prisoners being placed on a long waiting list for dental appointments.

84. **Exposure to feces and infection.** On Tier-II Segregation, there is a rampant problem with some prisoners who project feces, urine, or mixtures of the two onto staff, other prisoners, or other prisoners' cell doors, or even just out into the dorms, or at yard (hereinafter referred to as "projectors"). If a projector projects onto staff members, the matter is dealt with harshly, including disciplinary action, criminal prosecution, and/or physical use of force, such as tasing, pepper-spraying, and/or physically beating the projector. However, if a prisoner projects onto another prisoner, onto another prisoner's cell door, or even simply out into the dorm, no action is taken at all against the projector. As a result, the problems of projectors projecting onto other prisoners, onto another prisoners' cell doors, or even simply out into the dorm are rampant and out-of-control on Tier-II.

85. **Denial of cell sanitation:** Despite the contrary provisions of SOP, there is a widespread custom in GDC facilities of not providing segregation prisoners any opportunities for cell sanitation. HSP has a rampant mouse infestation problem which HSP Defendants ignore, such that dorms and cells are commonly infested with mouse feces. Although HSP officials purport to run cell clean-out or

sanitation three(3) times per week, they so not do so, which also endangers the health of prisoners on Tier II.

86. **Denial of yard call / outside recreation and exercise:** Despite the contrary provisions of SOP, there is a widespread custom in GDC facilities and at HSP in particular of not providing Segregation prisoners any opportunities for yard call / outside recreation and exercise hardly ever, if at all.

87. From Plaintiff's transfer to HSP on April 17, 2025, yard call was not run at all on Tier-II segregation for three months, until July 8, 2025.

88. Since July 8, 2025 to date, yard call has only been run twice more, or only about once per month.

89. **Denial of showers.** Despite the contrary provisions of SOP, there is a widespread custom in GDC facilities and at HSP in particular of not providing segregation prisoners opportunities for showers at all. Although GDC SOP purports to provide Segregation prisoners three(3) showers per week, in practice, they are often provided 0-2 showers per week.

90. **Denial of access to phone for emergencies.** The GDC maintain a custom in GDC facilities wherein, although they purport to provide access to a Prison Rape Elimination Act ("PREA") hotline, lockdown prisoners are often denied access to a phone with which to call the PREA hotline. The GDC maintain a custom in their facilities wherein, although they purport to provide access to a

suicide prevention hotline, lockdown prisoners are often denied access to a phone with which to call the suicide prevention hotline. At HSP, prisoners in segregation units, including Tier II, are denied all phone access on evenings, weekends, or holidays, and only allowed such access Mondays-Fridays 12:00pm-3:30pm (when friends are often at work and unable to talk). The result is that prisoner are denied access to the suicide prevention hotline when they most need it, when most suicides are committed or attempted on evenings, weekends, and holidays.

91. **Denial of access to emergency/panic buttons.** The GDC maintain a custom of removing or disabling cell emergency or panic buttons from cells in GDC facilities. At HSP, the lockdown cells have all had their emergency buttons removed or disable. As a result, prisoners in lockdown dorms have no way to summon or call for help in case of medical emergency, attack by other prisoners, or other bona fide need to call for help from a staff member. Many prisoners have died on segregation. The vast majority of natural deaths, suicides, and prisoner-on-prisoner homicides, all occur in segregation where prisoners are unable to summon help in cases of emergencies.

## J. Denial of parole eligibility on Tier-II Segregation.

92. GP prisoners have access to counseling classes, including parole-mandated classes, such as Substance Abuse, Moral Reconation Therapy ("MRT"), Thinking For a Change, Motivation for Change, Re-Entry Skills, Residential

30

Substance Abuse Treatment ("RSAT"), and other classes. Segregation prisoners do not. As a result of being denied access to parole-mandated classes, Tier II prisoners are *ineligible* for parole unless and until they are removed from segregation, returned to GP, and complete all parole-mandated classes.

### K. Atypical and significant hardship on Tier II in relation to the ordinary incidents of prison life.

93. GP prisoners are allowed out of their cells about 19 hours each day and are allowed to participate in religious services, counseling classes, educational classes, work details, yard call, gym call, library call, law library, and other out-of-cell activities. Tier II prisoners are locked down in one-man cells with solid steel doors 24 hours a day and are denied all to religious services, counseling classes, educational classes, work details, yard call, gym call, library call, law library, and other out-of-cell activities.

94. GP and Tier I prisoners have normal in-cell benefits, such as possession of personal property, commissary, book packages, clothing packages, and food packages; GED or other educational classes, such as vocational programs; work details; GP library; GP gym call; GP yard call; and television. Tier II prisoners do not have any of these.

95. GP and Tier I prisoners are allowed visits every Saturday, Sunday, and state holiday, from 9:00am to 3:00pm, with up to twelve(12) visitors. Tier II Phase 1 prisoners are allowed one(1) visit per month, for up to two(2) hours with up to

31

two(2) visitors only. Tier II Phase 2 prisoners are allowed two(2) visits per month, for up to two(2) hours with up to two(2) visitors only. Tier II Phase 3 prisoners are allowed three(3) visits per month, for up to two(2) hours with up to two(2) visitors only. SOP IIB09-0001, (Policy 209.08), Attachment 4. GP and Tier I prisoners are allowed contact visits. Tier II prisoners are allowed non-contact visit.

## VI. STATEMENT OF CLAIMS

### A-E. Claims challenging placements on Tier-II/Segregation and reviews on Tier-II/Segregation.

96. Plaintiff claims that the provision of GDC SOP 209.08 (IIB09-0003), "Administrative Segregation - Tier II," IV.B.1 (effective 4/11/16), as adopted by GDC Defendants—Oliver, Holt, Ford, Ammons, Ellis, Kennedy, McKinney, Caldwell, Toby, White, and Smith—and as implemented at HSP by HSP Defendants—Jones, McAlister, Illa, Hammock-Evans, Swinford, Rowland, Bradley, Averett, Porter, Stewart, Lowe, and Couch—that a prisoner may be placed on Tier II segregation if "The offender is noted as a threat to the safe and secure operation of the Facility," is unconstitutionally vague and violates substantive due process in violation of the Fourteenth Amendment Due Process Clause. Sheley v. Dugger, 833 F2d 1420, 1428(II.C) (11th.Cir.1987); Gumm v. Jacobs, No. 5:15-CV-00041-MTT-CHW (M.D.Ga. May 7, 2019) (Docs. 256-1 therein at 11, § III, ¶¶ 47) ("The criteria for assignment to the SMU or Tier III Program shall be modified to eliminate the provision that allows any inmate to be

assigned to the SMU if he is deemed 'a threat to the safe and secure operation of the Facility.'").

97. Plaintiff claims that the procedures set forth in GDC SOP 209.08 (IIB09-0003), "Administrative Segregation - Tier II," (effective 4/11/16), as adopted by GDC Defendants—Oliver, Holt, Ford, Ammons, Ellis, Kennedy, McKinney, Caldwell, Toby, White, and Smith—and as implemented at HSP by HSP Defendants—Jones, McAlister, Illa, Hammock-Evans, Swinford, Rowland, Bradley, Averett, Porter, Stewart, Lowe, and Couch— violates procedural due process in violation of the Fourteenth Amendment Due Process Clause.[5]

98. Plaintiff claims that Defendants Pineiro, Jones, Bradley, Stewart, Couch, McGhee, and Stricklin's personal participation in his placement on Tier II violates procedural due process in violation of the Fourteenth Amendment Due Process Clause. Sheley, 833 F2d at 1425(II.B.2)

**F. Claims challenging DR's used to place or keep Plaintiff on Tier II.**

---

[5] "An inmate facing disciplinary charges for misconduct must be accorded 24 hours' advance written notice of the charges against him, a right to call witnesses and present documentary evidence in defense unless so doing would jeopardize institutional safety or correctional goals, the aid of a staff member or inmate in presenting a defense provided the inmate charged with misconduct is illiterate or the issues are complex, an impartial tribunal, and a written statement of the reasons relied upon by the tribunal." Sheley v. Dugger, 833 F2d 1420, 1425(II.B.2) (11th.Cir.1986) (emphasis in original) (citing Wolff v. McDonnell, 418 U.S. 539, 563-72, 94 SC 2963, 2978-82, 41 LE2d 935 (1974)).

33

99. Plaintiff claims that GDC SOP IIB02-0001 (Policy Number 209.01), "Inmate Discipline," as adopted by GDC Defendants—Oliver, Holt, Ford, Ammons, Ellis, Kennedy, McKinney, Caldwell, Toby, White, and Smith—and as implemented at HSP by HSP Defendants—Jones, McAlister, Illa, Hammock-Evans, Swinford, Rowland, Bradley, Averett, Porter, Stewart, Lowe, and Couch—violates procedural due process in violation of the Fourteenth Amendment Due Process Clause. Sheley, 833 F2d at 1425(II.B.2).

100. Plaintiff claims that Defendants Pineiro, Jones, Bradley, Stewart, Couch, McGhee, and Stricklin's personal participation in considering any alleged DR in his placement on Tier II violates procedural due process in violation of the Fourteenth Amendment Due Process Clause. Sheley, 833 F2d at 1425(II.B.2)

**G. Claims challenging IR's used to place or keep Plaintiff on Tier II.**

101. Plaintiff claims that GDC SOP 203.03 (IIA04-0002), "Incident Reporting," as adopted by GDC Defendants—Oliver, Holt, Ford, Ammons, Ellis, Kennedy, McKinney, Caldwell, Toby, White, and Smith—and as implemented at HSP by HSP Defendants—Jones, McAlister, Illa, Hammock-Evans, Swinford, Rowland, Bradley, Averett, Porter, Stewart, Lowe, and Couch—violates procedural due process in violation of the Fourteenth Amendment Due Process Clause. Sheley, 833 F2d at 1425(II.B.2).

34

102. Plaintiff claims that Defendants Pineiro, Jones, Bradley, Stewart, Couch, McGhee, and Stricklin's personal participation in considering any alleged IR in his placement on Tier II violates procedural due process in violation of the Fourteenth Amendment Due Process Clause. <u>Sheley</u>, 833 F2d at 1425(II.B.2)

## H. First Amendment Claims of segregation/Tier II.

103. Plaintiff claims that the conditions on Tier II, including the denial of books, magazines, newspapers, photographs, radio, CD's/cassettes and CD/cassette players, JPay tablets and email access—pursuant to policies adopted by GDC Defendants—Oliver, Holt, Ford, Ammons, Ellis, Kennedy, McKinney, Caldwell, Toby, White, and Smith—and as implemented at HSP by HSP Defendants—Jones, McAlister, Illa, Hammock-Evans, Swinford, Rowland, Bradley, Averett, Porter, Stewart, Lowe, and Couch—violate: (1) the First Amendment; and (2) the RLUIPA.

104. Plaintiff claims that the custom of returning to sender all publications and photographs sent to prisoners on Tier II, without notice or an opportunity to protest the rejection—pursuant to customs adopted by GDC Defendants—Oliver, Holt, Ford, Ammons, Ellis, Kennedy, McKinney, Caldwell, Toby, White, and Smith—and as implemented at HSP by HSP Defendants—Jones, McAlister, Illa, Hammock-Evans, Swinford, Rowland, Bradley, Averett, Porter, Stewart, Lowe, and Couch—violates procedural due process under the Fourteenth Amendment

Due Process Clause. <u>Procunier v. Martinez</u>, 416 US 396, 417-19, 94 SC 1800, 1814, 40 LE2d 224 (1974) (mail); <u>Guajardo v. Estelle</u>, 580 F2d 748, 762 (5th.Cir.1978) (applying <u>Procunier</u> to publications); <u>Owen v. Wille</u>, 117 F3d 1235, 1237 (11th.Cir.1997) (applying <u>Procunier</u> to photographs); <u>Benning v. Commissioner, Georgia Dep't of Corr.</u>, 71 F4th 1324 (11th.Cir.2023) (applying <u>Procunier</u> to emails); <u>Daker v. Warren</u>, 660 FedAppx 737, ___(III.A), Nos. 13-14446, 14-10096, (11th.Cir. Aug. 22, 2016) (*per curiam*) (Slip.Op. at 10) (applying <u>Procunier</u> to packages).

105. Plaintiff claims that the denial of law library access on Tier II, with which to challenge Plaintiff's conviction, sentence, and conditions of confinement—pursuant to customs adopted by GDC Defendants—Oliver, Holt, Ford, Ammons, Ellis, Kennedy, McKinney, Caldwell, Toby, White, and Smith—and as implemented at HSP by HSP Defendants—Jones, McAlister, Illa, Hammock-Evans, Swinford, Rowland, Bradley, Averett, Porter, Stewart, Lowe, and Couch—violates his right of access to the courts under the First Amendment.[6]

---

[6] <u>Cruz v. Hauck</u>, 627 F2d 716, 720 (5th.Cir.1980) ("Federal Supplement from 1960 or so on should probably be available."); <u>Id.</u> (questioning whether two or three hours per week was "adequate to do meaningful legal research"; remanding for "the District court [to] reconsider this issue at the evidentiary hearing on remand"; holding that "the paramount consideration is whether the hours of availability are sufficient to provide time for meaningful legal research."); <u>Harris v. Thigpen</u>, 941 F2d 1495, 1527 (11th.Cir.1991) (segregated HIV prisoners retain court access rights).

106. Plaintiff claims that the denial of access to notary on Tier II, with which to challenge Plaintiff's conviction, sentence, and conditions of confinement—pursuant to customs adopted by GDC Defendants—Oliver, Holt, Ford, Ammons, Ellis, Kennedy, McKinney, Caldwell, Toby, White, and Smith—and as implemented at HSP by HSP Defendants—Jones, McAlister, Illa, Hammock-Evans, Swinford, Rowland, Bradley, Averett, Porter, Stewart, Lowe, and Couch—violates his right of access to the courts under the First Amendment. <u>Bounds v. Smith</u>, 420 US 817, 824-25, 97 SC1491 (1977) ("It is indisputable that indigent inmates must be provided at state expense… with notarial services to authenticate [legal documents]….").

107. Plaintiff claims that his placement on Tier II violates: (1) the First Amendment; and (2) the RLUIPA, because it causes him to be denied religious exercise, including: (A) Jumu'ah Islamic service; (B) Ta'lim Islamic service; (C) 'Eid Islamic service; (D) 'Eid feast; (E) Islamic books; (F) Islamic CD's; and (G) JPay tablet computers with which to send and receive emails with information and ideas to and from imams, Islamic scholars, and Islamic religious advisers.

**I. Eighth Amendment Claims of segregation/Tier II.**

108. Plaintiff claims that his placement on Tier II—pursuant to customs adopted by GDC Defendants—Oliver, Holt, Ford, Ammons, Ellis, Kennedy, McKinney, Caldwell, Toby, White, and Smith—and as implemented at HSP by

37

HSP Defendants—Jones, McAlister, Illa, Hammock-Evans, Swinford, Rowland, Bradley, Averett, Porter, Stewart, Lowe, and Couch—violates the Eighth Amendment. <u>Sheley v. Dugger</u>, 833 F2d 1420, 1428-30(II.D) (11th.Cir.1987).

109. Plaintiff claims that the conditions on Tier II, including the denial of adequate food, medical care, dental care, sanitation, sunlight, outside exercise, <u>Bass v. Perrin</u>, 170 F3d 1312, 1316-17(II.A) (11th.Cir.1998), and the exposure to feces, and flooding—pursuant to customs adopted by GDC Defendants—Oliver, Holt, Ford, Ammons, Ellis, Kennedy, McKinney, Caldwell, Toby, White, and Smith—and as implemented at HSP by HSP Defendants—Jones, McAlister, Illa, Hammock-Evans, Swinford, Rowland, Bradley, Averett, Porter, Stewart, Lowe, and Couch—violate the Eighth Amendment.

## VII. RELIEF SOUGHT

110. Plaintiff seeks declaratory judgments.

111. Plaintiff seeks prospective, equitable, and injunctive relief.

112. Plaintiff seeks nominal damages, unspecified compensatory damages, and unspecified punitive damages.

113. Plaintiff seeks costs of prosecuting this action.

114. Plaintiff seeks other such relief that the court deems necessary or appropriate.

## VIII. DEMAND FOR JURY TRIAL

115. Pursuant to the Seventh and Fourteenth Amendments to the United States Constitution, Plaintiff demands a jury trial on all issues triable by a jury.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the above and foregoing are true and correct to the best of my knowledge.

This __21st__ Day of __MARCH__, 2026

_____
**DOWAINE MCKENZIE**
Plaintiff, *pro se*

ID#1129133
Hays State Prison
777 Underwood Drive
P.O. Box 668
Trion, GA 30753

39